UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| MATTHEW KING, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-04412-JRS-TAB |
| | ) | |
| HENDRICKS COUNTY COMMISSIONERS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**Order on Defendants' Motion for Summary Judgment**

A Hendricks County Sheriff's deputy conducting a welfare check at the home of Plaintiff Matthew King fired one fatal shot at Plaintiff's son, Brad King. Plaintiff, individually and on behalf of Brad's estate, alleges federal civil-rights claims and state civil-rights and tort claims against the Hendricks County Commissioners, the Hendricks County Sheriff's Department, Sheriff Brett Clark in his official capacity, and Deputy Jason Hays in his official and individual capacities. Defendants move for summary judgment, and that motion is now fully briefed and ripe for decision.

**I. Background**

Brad King lived with his parents, Matthew and Gina King, in Hendricks County. (M. King Dep. Tr. 8:2–9, ECF No. 40-1 at 4.) He was 29 years old and suffered from paranoid schizophrenia. (*Id.* 7:18–22, 14:6–8.) His parents helped him find and finance treatment—including medication—to manage his condition. (*Id.* 19:4–22:2.) His parents also made sure that he took his medication every evening. (*Id.* 23:24–

1

24:4.) Despite the treatment, Brad had "good days and bad days." (*Id.* 22:3–9.) On a "good day," Brad would be "out socializing," while on a "bad day, Brad "would be more quiet and stay in his room." (G. King Dep. Tr. 21:5–16.) Brad "seemed like he was confused a lot," (M. King Dep. Tr. 62:11–12), and sometimes "walk[ed] around in a daze" with a "glazed-over look" in his eyes, (*id.* 17:1–6).

Like many who suffer from paranoid schizophrenia, Brad fixated on knives, even sleeping with a small knife under his pillow. (*Id.* 33:16–34:8.) Brad's parents were not worried about this fixation, seeing it as a common symptom of his condition, and Brad had access to the many knives in the house. (*Id.* 35:4–18.) Brad's parents were worried, however, that Brad might call 911 when he was having a "bad day" and felt he needed to talk to someone. (*Id.* 54:10–21.)

Brad had a history of calling 911. Once, paramedics were dispatched and took him to a hospital. (*Id.* 33:1–8.) Another time, the Hendricks County Sheriff's Department responded. Brad had a knife; the Sheriff's deputies had him discard the knife before taking him to the emergency room. (*Id.* 33:9–15.) But Brad's father, who works for a newspaper, had seen news reports where police misinterpreted symptoms of mental illness as threats, with fatal consequences. (*Id.* 7:2–4, 54:1–14, 58:11–24.) So he insisted that Brad call a family member instead of 911. (*Id.* 56:18–23.)

On November 29, 2016, Brad "was obviously having a bad day," (*id.* 22:10–11), though his parents did not notice anything out of the ordinary at the time, (*id.* 25:14–

24). Brad typically woke up in the afternoon and stayed awake until the early morning; that day, he was still awake when his parents left for work. (*Id*. 25:2–12.) Before leaving, his father told Brad to go to bed. (*Id*. 25:10–12.)

While his parents were at work, Brad called 911, identified himself as "Brad Grout," and said, "Could you come over to my house real quick? I'm just going through a little psycho phase." (Compl. ¶ 12.) Deputy Hughes, a full-time merit deputy, and Defendant Deputy Jason Hays, a volunteer reserve deputy, were dispatched to the Kings' house for a welfare check. (Thomas Dep. Tr. 13:10–20.) Deputies Hughes and Hays knocked on the front door but there was no response. A dog in the house's picture window barked loudly. (Hays Dep. Tr. 11:9–14.) The deputies checked the yard and two mini-barns but did not encounter anyone. So they left.

After the initial welfare check by Deputy Hughes and Deputy Hays, Brad called 911 again and again, hanging up each time. (ECF No. 40-12 at 1.) At 2:30 p.m., Deputy Jeremy Thomas, a volunteer reserve deputy, was dispatched for a welfare check on "Brad Grout," who "called earlier stating he wasn[']t in right frame of mind." (*Id*.) All the full-time merit deputies were in a department-wide meeting. (B. Clark Dep. Tr. 10:22–11:4.) Deputy Thomas called Deputy Hays and asked him to go along to the Kings' home since Hays had been there earlier that day. (Thomas Dep. Tr. 13:1–9; Hays Dep. Tr. 11:4–9.)

According to the radio log, Hays and Thomas arrived separately at the Kings' home at 2:42 p.m. (ECF No. 40-12 at 1.) Deputies Thomas and Hays walked up the driveway to the front door. (Hays Dep. Tr. 12:9–12.) Thomas knocked on the door

3

repeatedly and announced, "Sheriff's Department." (*Id.* 12:14–16.) The dog barked as before. (*Id.* 12:21–22.) Having received no response, the deputies made their way to the north side of the house. (*Id.* 12:25–13:2.) They checked two other doors, which were shut and locked, before heading around to the back of the house. (*Id.* 13:3–6.) They checked the back windows but did not see any movement or signs of distress. (*Id.* 13:24–14:2.)

Deputy Thomas then walked across the yard toward two mini-barns, and Deputy Hays walked toward the south side of the house. (*Id.* 14:4–9.) Hays peeked around the south side of the house and saw nothing. (*Id.* 14:10–12.) Hays told Thomas that he had checked the mini-barns on the earlier dispatch, and they were locked. (*Id.* 14:12–14.) So the two deputies started walking toward the northeast corner of the house—back the way they had come. (*Id.* 15:4–11.) About two minutes had passed since they arrived. (*Id.* 14:18–15:2.)

As the deputies approached the northeast corner—at an angle to each other forming a "V" or pie shape—they noticed Brad walking toward them along the northeast side of the house. (*Id.* 15:4–16:2; Thomas Dep. Tr. 21:9–14.) Brad was wearing shorts and a hooded sweatshirt; he stared straight ahead and had his hands in the front pockets of his shorts "very awkwardly." (Thomas Dep. Tr. 22:19–23:5; Hays Dep. Tr. 16:5–10.) Deputy Thomas asked Brad to identify himself, and he told the deputies he was "Brad Grout." (Thomas Dep. Tr. 22:16–17; Hays Dep. Tr. 16:19–20.) About twenty feet separated Brad from the deputies—close enough that they "didn't have

4

to yell"—and Brad and the deputies continued to walk toward each other. (Hays Dep. Tr. 16:22–17:7.)

The parties dispute what happened next.

Deputies Thomas and Hays testify that Thomas asked Brad to remove his hands from his pockets. (Thomas Dep. Tr. 23:16–17; Hays Dep. Tr. 17:5–8.) The deputies were just farther than arms reach from each other, (Thomas Dep. Tr. 24:15–21), and about ten feet separated them from Brad, (Hays Dep. Tr. 17:5–8). Brad withdrew his hands from his pockets to reveal a knife in his left hand—the hand closest to Deputy Thomas—and took a few "short, choppy steps" toward the deputies. (Thomas Dep. Tr. 23:18–20, 24:4–8, 28:16–20.) Deputy Thomas ordered Brad to drop the knife. (Thomas Dep. Tr. 23:18–20.) Deputy Hays then noticed the knife, too, and ordered Brad to drop it. (Hays Dep. Tr. 17:9–14.) As they ordered Brad multiple times to drop the knife—in a "very authoritative, loud, direct manner"—the deputies backpedaled with their service weapons drawn. (Hays Dep. Tr. 17:15–17, 18:2–4, 21:4–5; Thomas Dep. Tr. 24:9–13.) In these first few seconds, the deputies backpedaled at an angle from Brad, increasing the distance between the deputies while Brad advanced forward generally—not toward either deputy more than the other. (Thomas Dep. Tr. 28:21–29:14; Hays Dep. Tr. 19:18–20:10.)

Brad had a "very blank stare"—"his face looked just emotionless." (Thomas Dep. Tr. 26:8–9; Hays Dep. Tr. 27:18.) He raised his hands to ear-level, holding the knife with the blade sticking out from the heel of his left hand, toward the deputies. (Thomas Dep. Tr. 23:19–24; Hays Dep. Tr. 18:6–19:9.) He turned his head quickly

5

between Deputy Thomas and Deputy Hays. (Hays Dep. Tr. 20:18–20.) Brad then turned "hard right" toward Deputy Hays and—still holding the knife ear-level, blade toward Deputy Hays—began a "very hard charge, full-out sprint, leaning, lunging motion." (Thomas Dep. Tr. 28:10–29:16; *see also* Hays Dep. Tr. 20:20–24.)

As Brad charged, Deputy Hays continued to backpedal and order Brad to drop the knife. (Hays Dep. Tr. 20:24–21:3; Thomas Dep. Tr. 30:19–20.) Brad was eight to ten feet away, in a "running motion, somewhat bent over," when Deputy Hays fired a single shot, aiming for the torso. (Hays Dep. Tr. 20:24–21:3, 23:12–24:6; Thomas Dep. Tr. 30:19–21.) Brad stopped, fell to a knee, and then twisted and fell onto his back. (Thomas Dep. Tr. 31:7–11; Hays Dep. Tr. 24:20–25.)

Deputy Thomas checked Brad for signs of life; his breathing was agonal, clearly nearing death. (Thomas Dep. Tr. 32:3, 16–18.) Deputy Thomas and Deputy Hays each radioed "shots fired" at about 2:46 p.m., just four minutes after arriving at the Kings' home. (ECF No. 40-12 at 1; Thomas Dep. Tr. 32:21–22.) Brad died at the scene. (Compl. ¶¶ 17–18.)

In the autopsy, the forensic pathologist found that a single bullet entered through Brad's left upper arm into his left upper chest. (ECF No. 40-8 at 1, 3.) The entrance wound was 15 inches below the top of the head. There was no exit wound, and the bullet was recovered 21 inches below the top of the head. (*Id.* at 3.) The "wound path was directed left to right, downwards and slightly front to back." (*Id.* at 3–4.)

A carving knife was found beneath Brad's left hand, though Brad was right-handed. (Thomas Dep. Tr. 33:24–34:1; M. King Dep. Tr. 37:7–9, 101:17–18.) The

6

knife had a five- or six-inch blade with a five-inch, wooden handle. (M. King Dep. Tr. 37:11–14.) Brad's father recognized it as part of a set from the Kings' kitchen. (M. King Dep. Tr. 37:16–18, 65:7–12, 101:11–16.) The knife was sent for latent fingerprint examination, but the examiner found no friction ridge detail sufficient for comparison purposes. (M. Marvin Rep. at 2, ECF No. 40-5 at 2.)

Plaintiff contends that Brad did not charge at Deputy Hays with a knife. Brad's father testifies that the deputies' loud orders would have "caused [Brad] nothing but fear," and he "was probably super confused," but Brad "wouldn't react in a violent manner" and "wouldn't have charged them with a knife." (M. King Dep. Tr. 102:13–16.) Brad's mother likewise testifies that Brad was "sweet" and that she "would never think anybody would misunderstand anything he would do." (G. King Dep. Tr. 26:11–14.) As Brad did not survive to testify, Plaintiff relies solely on purported inconsistencies between the deputies' testimony and other evidence. Those inconsistencies and Plaintiff's arguments are discussed in detail below.

## II. Legal Standard

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the district court "must construe all the facts and reasonable inferences in the light most favorable to the nonmoving party." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017). However, the district court

must also view the evidence "through the prism of the substantive evidentiary burden," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986), and does not draw "inferences that are supported by only speculation or conjecture," *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). To withstand a properly supported motion for summary judgment, Plaintiff "must do more than raise some metaphysical doubt as to the material facts; he must come forward with specific facts showing that there is a genuine issue for trial." *Id*. "[D]iscredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion. Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 256–67. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III. Discussion

*A. Section 1983 Claim against Deputy Hays for Violation of the Fourth Amendment*

Section 1983 authorizes private suits to redress deprivations of constitutional rights. *See* 42 U.S.C. § 1983. The Fourth Amendment provides that the "right of the people to be secure in their persons . . . against unreasonable . . . seizures, shall not be violated . . . ." U.S. Const. amend. IV. A law enforcement officer's use of deadly force against a free citizen is a "seizure" within the meaning of the Fourth Amendment and must be reasonable. *Graham v. Connor*, 490 U.S. 386, 395 (1989).

Whether use of deadly force constitutes a constitutionally "reasonable" seizure is an objective inquiry and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Proper application of that standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

"If the suspect threatens the officer with a weapon, deadly force may be used. At that point, the risk of serious physical harm to the officer or others has been shown." *Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018) (internal citations omitted). The availability of less-deadly alternatives does not alter the Fourth-Amendment analysis so long as the use of deadly force was constitutionally reasonable. *See Plakas v. Drinski*, 19 F.3d 1143, 1149 (7th Cir. 1994) ("We do not believe the Fourth Amendment requires the use of the least or even a less deadly alternative so long as the use of deadly force is reasonable . . . .").

Thus, as Plaintiff concedes, Deputy Hays's use of deadly force was constitutionally reasonable if Brad did, indeed, charge at Hays with a knife. (*See* Pl.'s Mem. at 11, ECF No. 42 at 11.) At issue is whether Plaintiff has adduced evidence to raise a

9

genuine factual dispute, namely to permit a rational jury to find that Brad did not charge at Hays with a knife. The Seventh Circuit has recognized the "practical problems a plaintiff alleging deadly force may face in resisting summary judgment" because "the witness most likely to contradict the officers' testimony is dead." *Maravilla v. United States*, 60 F.3d 1230, 1233 (7th Cir. 1995). In such instances, it is "wise to examine all the evidence to determine whether the officers' story is consistent with other known facts." *Id.* at 1233–34. Plaintiff contends that inconsistencies between the deputies' testimony and "other known facts" would permit a jury to find that Brad was not holding a knife and did not charge at Deputy Hays.

Several courts have denied summary judgment where physical evidence plainly contradicts the defendant-officers' self-serving testimony. In *Cruz v. City of Anaheim*, 765 F.3d 1076 (9th Cir. 2014), the defendant-officers claimed Cruz had exited his vehicle, turned to face forward, and reached for his waistband with his right hand. *Id.* at 1078–80. Five officers fired twenty shots. *Id.* at 1078. When the dust settled, Cruz's lifeless body was still buckled in his seatbelt and there was no weapon in his waistband. *Id.* Cruz was left-handed. *Id.* at 1080. What's more, one of the defendant-officers used the same story—suspect reached for a non-existent gun in his waistband—to justify a subsequent shooting. *Id.* In reversing summary judgment, the Ninth Circuit explained that a jury could reasonably conclude that the officers had lied and that Cruz had not reached for his waistband. *Id.*

In *Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999), the defendant-officer testified that Abraham was driving straight at her at close range when she fired a fatal shot

10

through the windshield. *Id.* at 284–85. But the physical evidence showed that the gunshot went through the driver's side window, and the autopsy photograph showed that the bullet entered Abraham's body through the back of his arm. *Id.* at 285. In reversing summary judgment for the defendant, the Third Circuit found that there was a genuine dispute whether Abraham was driving toward the defendant-officer when she fired. *Id.* at 293; *see also Rincon v. United States*, No. 2:10-cv-268, 2012 WL 1981725 (N.D. Ind. June 1, 2012) (denying summary judgment on similar facts). Similarly, in *Capps v. Olson*, 780 F.3d 879 (8th Cir. 2015), the defendant-deputy testified that Capps was running toward him with a knife, 20 to 25 feet away, when he fired five shots. *Id.* at 882. But the plaintiff's expert testified that the defendant-deputy's first shot entered through the back of Capps's shoulder. *Id.* at 885. Moreover, the deputy radioed "weapons unknown," and neither searched the scene for a weapon nor alerted other responding officers to the presence of a weapon. *Id.* No knife was recovered from the scene. *Id.* The Eighth Circuit affirmed the denial of summary judgment, finding genuine disputes of facts material to the reasonableness of the defendant-deputy's use of deadly force. *Id.*

Courts have not, however, found genuine factual disputes based on ambiguities, minor inconsistencies, or speculation. In *Tom v. Voida*, 963 F.2d 952 (7th Cir. 1992), the defendant-officer testified that she was on the ground with her weapon drawn and told Tom repeatedly, "Please. Don't make me shoot you." *Id.* at 955. Tom moved toward her anyway, and the defendant-officer fired an errant shot. *Id.* Tom stepped back, then lunged at her again with his arms outstretched, and the defendant-officer

11

fired a second, fatal shot. *Id.* The plaintiff argued that "most people do not attack someone for the first time after they have been shot at, especially when they are unarmed." *Id.* at 961. The Seventh Circuit found that the plaintiff's "pure speculation" did not create a genuine dispute of material fact. *Id.* The plaintiff also argued that "inherent contradictions" in the defendant-officers' statements precluded summary judgment. The Circuit held, "To the extent there are minor ambiguities in [the defendant's] statements, these ambiguities do not relieve the plaintiff of the burden of presenting affirmative evidence to support her case." *Id.*; *see also Franklin v. Manek*, No. IP 02-1083, 2004 WL 1629544, at *8 (S.D. Ind. June 8, 2004) (finding the evidence substantially consistent with the defendant-officer's testimony and granting summary judgment).

So too here. Like *Tom*, and unlike *Cruz*, *Abraham*, and *Capps*, the evidence here—including Deputy Thomas's testimony—is consistent with Deputy Hays's account of the shooting. Plaintiff's arguments, conjecture, and speculation do not create a genuine dispute of any material fact.

Plaintiff contends that a jury could reasonably conclude that Brad was not holding the knife because no fingerprints were found on the knife handle. (Pl.'s Mem. at 2.) The Seventh Circuit has acknowledged that the prevalence of fingerprint evidence is a "common misconception." *United States v. Common*, 818 F.3d 323, 330 (7th Cir. 2016); *see also United States v. Glover*, 479 F.3d 511, 518 (7th Cir. 2007) (expert testimony "assisted the jury in understanding that, despite what they might see on popular television crime shows, certain objects are not particularly conducive to finding

12

prints"); *United States v. Paladino*, 401 F.3d 471, 478 (7th Cir. 2005) ("In fact [failure to find fingerprints on a gun] is extremely common: 'successful development of latent prints on firearms is difficult to achieve. In reality, very few identifiable latent prints are found on firearms, a fact that has been discussed in both literature and the judicial system.'") (internal citation omitted). The Circuit has accordingly expressed skepticism about the inferential significance of the absence of fingerprints. *See Paladino*, 401 F.3d at 478 ("That there was no fingerprint evidence meant simply that there was no fingerprint evidence. Had [defendant's] fingerprints been found on the gun, this would have helped the government and if someone else's fingerprints had been found on the gun, this would have helped [defendant] . . . . Since no fingerprints were found, neither side was helped[.]"); *United States v. Molton*, 743 F.3d 479, 484 (2014) ("[T]he lack of fingerprints on the firearm is unsurprising: trial testimony established that the rifle was well-oiled."); *United States v. Wilson*, 303 F. App'x 350, 353 (7th Cir. 2008) ("we find no merit to Wilson's contention that the absence of fingerprints on the recovered handgun casts doubt on the reliability of the officers' version of events"). Here, the lack of fingerprint evidence does not contradict the deputies' testimony but merely fails to corroborate it further.

Plaintiff also argues that the deputies' testimony is inconsistent with certain of Brad's preferences and tendencies. Plaintiff argues that it is improbable that Brad would have carried a ten-inch knife in his pocket, particularly because he had a favorite, smaller knife that he kept under his pillow. (Pl.'s Mem. at 3.) Brad's preference for a different knife does not create a genuine dispute of material fact. And while

carrying a ten-inch knife in one's pocket is odd, it is fully consistent with Deputy Thomas's testimony that Brad had his hands in his front pockets "very awkwardly." (Thomas Dep. Tr. 22:19–20.)

Similarly, Plaintiff argues that it is improbable that Brad would have held the knife in his left hand because Brad was right-handed. Whether the knife was in Brad's right hand or his left is not material to the reasonableness of Deputy Hays's use of force. Nor is the deputies' testimony that Brad held the knife in his non-dominant hand evidence enough for a rational jury to find that the deputies fabricated their story and planted the knife on Brad's body, especially as the bullet wound to Brad's left arm is consistent with the deputies' testimony that the arm was raised holding the knife.

Plaintiff also argues that the deputies' deposition testimony that Brad held the knife in his left hand conflicts with Deputy Hays's December 2, 2016, statement, "I believe it was in the right hand." (Pl.'s Mem. at 2.) Viewed in its entirety, Deputy Hays's 2016 statement is substantially consistent with his and Deputy Thomas's subsequent deposition testimony. Specifically, though Hays stated in 2016 that he believed the knife was in Brad's right hand, he has consistently maintained that Brad held the knife in the hand closest to Deputy Thomas—which, from context, was Brad's left, the deputies' right—such that Hays first noticed the knife when Thomas ordered Brad to drop it.

Corroborating the deputies' uncontroverted testimony that Brad held the knife is the further uncontroverted summary judgment evidence that the knife was recovered

14

from beneath Brad's left hand; that the knife came from the Kings' home; that Brad had access to all the knives in the Kings' home; that, like many with his condition, Brad fixated on knives; and that Brad had a knife in a previous encounter with Hendricks County Sheriff's deputies. There is no genuine dispute that Brad was in fact holding the knife when Deputy Hays fired.

Plaintiff also contends that Brad did not charge at Deputy Hays, arguing that the bullet trajectory is inconsistent with Hays's account of the shooting. (Pl.'s Mem. at 7–8.) It is not. Both deputies testified that Brad was bent forward while charging, consistent with the bullet's downward wound path, travelling six inches downward between entry wound and where the bullet was recovered. Plaintiff's expert does not suggest that the downward and left-to-right trajectory of the wound path is inconsistent with the deputies' account. (*See* Marso Rep., ECF No. 40-9.)

Plaintiff further argues that Brad simply would not have behaved as the deputies described. (Pl.'s Mem. at 6–7.) Brad's father testifies that Brad "wouldn't react in a violent manner" and "wouldn't have charged them with a knife." (M. King Dep. Tr. 102:13–16.) Brad's mother likewise testifies that Brad was "sweet" and that she "would never think anybody would misunderstand anything he would do." (G. King Dep. Tr. 26:11–14.) Brad's parents' testimony underscores the tragedy of their loss, but they lack personal knowledge of the relevant events of November 29, 2016; their speculative testimony does not create a genuine dispute of material fact.

Plaintiff contends that Hays had enough time to call an ambulance (prior to the shooting) or deploy less-lethal force. (Pl.'s Mem. at 8.) "There is no precedent in this

15

Circuit (or any other) which says that the Constitution requires law enforcement officers to use all feasible alternatives to avoid a situation where deadly force can justifiably be used." *Plakas* 19 F.3d at 1148. There was thus no constitutional requirement that Hays call an ambulance immediately upon encountering Brad. Hays's orders to drop the knife and his subsequent use of deadly force in the face of an imminent threat to his safety were objectively reasonable in light of "the information [Hays] possessed immediately prior to and at the very moment he fired the fatal shot." *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988). Because Hays's use of deadly force was constitutionally reasonable, the Fourth Amendment does not require that he use a less-lethal alternative. *See Plakas*, 19 F.3d at 1149 ("We do not believe the Fourth Amendment requires the use of the least or even a less deadly alternative so long as the use of deadly force is reasonable . . . .").

Plaintiff disputes Defendants' characterization of the record in various other respects: the extent to which Brad was or was not athletic, the extent to which Brad's medication was or was not working, and the extent to which the reserve deputies were or were not experienced. (Pl.'s Mem. at 4–6, 8–9.) These disputes are not material to the objective reasonableness of Deputy Hays's use of deadly force and therefore do not preclude summary judgment.

Brad's parents have suffered a great loss. But on this summary judgment record, a jury could not reasonably find that their loss resulted from an unconstitutional use of deadly force. Defendant Deputy Hays is therefore entitled to summary judgment on Plaintiff's § 1983 claim.

*B. Section 1983 Claim against the Hendricks County Commissioners, the Hendricks County Sheriff's Department, and Sheriff Brett Clark*

Under *Monell v. New York City Dep't Soc. Servs.*, 436 U.S. 658, 694 (1978), a local government may be liable for the constitutional torts of its employees or agents where "the execution of a government's policy or custom . . . inflicts the injury[.]" But there can be no municipal liability where the individual agent or employee—here, Deputy Hays—inflicted no constitutional injury. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Defendants are therefore entitled to summary judgment on Plaintiff's *Monell* claim.

*C. ADA and Rehabilitation Act Claim against the Hendricks County Commissioners and the Hendricks County Sheriff's Department*

Plaintiff alleges that the Hendricks County Commissioners and the Hendricks County Sheriff's Department violated Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act. (Compl. ¶¶ 34–44.) Claims under the two statutes are "functionally identical" and may be considered together. *Hamilton for J.H. v. City of Fort Wayne*, No. 1:16-cv-132, 2017 WL 5467038, at *3 (N.D. Ind. Nov. 13, 2017) (citing *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015)). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132

Plaintiff alleges that the Commissioners and the Sheriff's Department failed to reasonably accommodate Brad's mental disability by modifying their services, citing

several proposed accommodations alleged in the Complaint. (Pl.'s Mem. at 20.) A Title II claim under the ADA "may be established by evidence that . . . the defendant refused to provide a reasonable modification," *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 754 (7th Cir. 2006) (en banc), but "an accommodation only is required when *necessary* to avoid discrimination *on the basis of* a disability," *id.* at 751. The necessity element is "a causation inquiry" which "is satisfied only when the plaintiff shows that 'but for' his disability, he would have been able to access the services or benefits desired." *Id.* at 754.

Plaintiff contends that Brad was denied the benefit of Defendants' 911 emergency services when he was fatally shot by the volunteer reserve deputy responding to his 911 call. But there are no facts in the record from which a jury could reasonably infer that the shooting occurred because of his disability rather than because he charged at Deputy Hays with a knife. *See Wis. Cmty. Servs.*, 465 F.3d at 754 ("As far as this record indicates, the City would have rejected similar proposals from non-profit health clinics serving the non-disabled."); *Hamilton*, 2017 WL 5467038, at *4 ("There is nothing in the record to suggest that Officer Green's response to J.H.'s resistance and kicking another officer would have been different if J.H. was not disabled, or that the same injury would not have been inflicted on a person with full mental capacity."). "As a matter of substantive disability law, a case may not go to a jury without any evidence from which the jury could plausibly infer that the service being denied was denied because of a disability." *Id.* Defendants are therefore entitled to summary judgment on Plaintiff's ADA and Rehabilitation Act claims.

*D. State-Law Claims*

The Court's jurisdiction in this case arises from Plaintiff's federal-law claims, with supplemental jurisdiction over the state-law claims authorized by 28 U.S.C. § 1367. All Plaintiff's federal-law claims are dismissed by this order, and "the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 727 (7th Cir. 1998); *see also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if— . . . the district court has dismissed all claims over which it has original jurisdiction"). The Court therefore declines to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims. Pursuant to § 1367(d), the limitations periods for those state-law claims have been tolled—*i.e.*, the limitations clock has been stopped—for the pendency of this case and shall be tolled for an additional thirty days from the entry of this order, so Plaintiff will not be unduly prejudiced by dismissal. *See Artis v. District of Columbia*, 138 S. Ct. 594, 598 (2018) ("We hold that § 1367(d)'s instruction to 'toll' a state limitations period means to hold it in abeyance, *i.e.*, to stop the clock."). Plaintiff's remaining state-law claims are dismissed without prejudice.

## IV. Conclusion

For the reasons explained above, Defendants' motion is **granted**, and Plaintiff's federal-law claims are **dismissed** on the merits with prejudice. Plaintiff's remaining

19

state-law claims are **dismissed** without prejudice. The pending motion to continue (ECF No. 47) is **denied as moot**. Final judgment shall issue separately.

**SO ORDERED.**

Date: 5/23/2019

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Caren L. Pollack
POLLACK LAW FIRM, P.C.
cpollack@pollacklawpc.com

Jessica A. Wegg
SAEED & LITTLE LLP
jessica@sllawfirm.com